The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning. We have two cases this morning that we've consolidated for purposes of argument only. The cases are 21407, Takeda Pharmaceuticals v. Mylan Pharmaceuticals, and case number 201545, Takeda Pharmaceuticals v. Alcom Laboratories, Ltd. Let me just say at the outset that you all are participants in yet one of many new things we've been doing over the past few months, because this is the first oral argument we're having where no one involved in the argument is actually physically at the court. We were told for security purposes to not enter the court over a period of a few days. Everything's fine, but I appreciate all of the efforts of our clerk's office and IT in seamlessly, hopefully, making this happen. So we're ready to proceed, Mr. Fleming, whenever you are. Good morning, Your Honors. May it please the court, Porter Fleming for Takeda. We are here today on appeal of a district court decision that denied Takeda's motion for a preliminary injunction against Mylan and Alcom. The district court held that Takeda had failed to show that it was likely to succeed on the merits. I'm sorry, Mr. Fleming. Sorry to interrupt. This is Sharon Prowse. Just let me ask you a sort of technical housekeeping question at the outset. What is the current status of this product and the case and so forth? I know our court has been involved as a preliminary matter through motions. So can you just give us an update of what the status is now? Sure, Your Honor. The status is that following the court's denial of our injunction pending the appeal, my understanding is that both Mylan and Alcom relaunched their products, their generic ANDA products that compete with the Colchris brand product. So in the market today is the brand Colchris product, an authorized generic product that's sold by PAR, as well as a Mylan product and an Alcom product. And what about this? Yes. And the proceedings in Delaware, Your Honor, basically we had the preliminary injunction hearing. And following that ruling, that case hasn't been officially stayed, but there's been no activity subject to, I assume, a decision from this panel. Okay. Thank you very much. Sorry to take your time. We'll add a couple more minutes because I didn't want to take your time. I just appreciate your update. Thank you. Yes. So our position here on appeal is that the district court erred in concluding that Section 1.2D of the license agreement had been triggered by an earlier case, which is called the Westward case. I'd like to go specifically to Section 1.2D. It has specific language. The language is virtually identical for both Mylan and Alcom. There are a few little differences, but for purposes of the appeal, I think we could conclude that the language is the same and that a determination with respect to 1.2D would apply equally to Mylan and Alcom. Turning to the specific language of 1.2D, 1.2D was or requires that there be a final court decision holding that all unexpired claims of licensed patents were asserted and adjudicated against third party are either, one, not infringed, or two, a combination of not infringed and invalid. In the Westward litigation, which involved a product called Mitigare, there were claims of eight patents that were asserted. Of those eight patents, five of those patents were voluntarily dismissed. Those five patents were dismissed on a voluntary dismissal that we have repeatedly and consistently argued that the voluntary dismissal constituted an adjudication. I would direct the court to appendix page 3420, which is a copy of the preliminary injunction brief that was filed at the district court level. I would direct the court to the opening brief in the Mylan appeal, page 18, where we state a voluntary dismissal with prejudice constitutes an adjudication. I would direct the court to the opening brief in Alcom, page 22, where we again state a voluntary dismissal with prejudice constitutes an adjudication. Your position is, so that means that the claims were all asserted and they were all adjudicated? Correct, of all eight patents. Now, why that matters is the language of 1.2D requires a holding where there is either a finding of non-infringement or a combination of non-infringement and invalidity. In the Westward case, there was a summary judgment decision where three patents were adjudicated to be found not infringed. The problem, which we say is how the court erred, is the court focused on only those three patents that were the subject of the summary judgment decision. Let me ask you, one of the things that, I'm sorry, this is just pressed again, sorry to keep interrupting, but one of the things that I recall Judge Andrews pointed to was the ramifications of the construction you're asserting. In other words, I think he gave the hypothetical that, well, that means that you could assert whatever or anything could be asserted and then if just one claim or one patent is withdrawn for any reason, I'm not necessarily suggesting a nefarious purpose, but for any reason, then that would mean that the section would not be operative. And he construed that as being really something that's up for gamesmanship and doesn't seem to be what is intended by this provision. So what is your response to that? My first response is, Your Honor, is that if you look at the license agreement, Section 1.2 is titled Generic Entry Dates. Both Milan and Alchem agreed under Section 1.2A to a specific date where they would get a license to practice these patents. What we're looking at 1.2D is an exception. Something has changed. It's a limited exception. It's a specific exception. And so, yes, with respect to this exception, which would mean a change in the status quo, that requires that there would have to be a holding of all patents or claims of patents that were asserted and adjudicated. So, yes, we are saying that there would have to be a finding of non-infringement or a combination of non-infringement for all claims that were asserted and adjudicated. That is the clear and unambiguous language of Section 1.2. I guess I'm not hearing a real response to my question, which is that means the parties entered into, you're right, it's an exception, but that the parties have entered into something for which you maintain entire control in terms of what can be asserted, and you can effectively really easily and readily make sure that this exception never comes into play. And that doesn't seem the norm in terms of negotiating. Whether it's an exception or not, that seems a little odd and one-sided. Your Honor, I understand what you're asking, and the answer is we do not, Takeda, one side does not control this. To the extent that a defendant, which is not uncommon, and that's why we gave the example of the 30-month stay, a defendant can request that the dismissal have language which would say there is no non-infringement. And actually we have attached to our paper situations where Mylan has entered into dismissals of cases where certain patents, they have required language that the patent was not infringed. And specifically I'm referring to Appendix Page 4118 and Appendix Page 4120. And in both of those cases, Mylan sought a statement that their product did not infringe a patent that was at issue, and that the remaining patents then continue to further adjudication. So, no, it is not a situation where there can be gamesmanship. There is a situation where the defendant can seek language in the dismissal setting forth either non-infringement or that the patent's invalid, which would protect it from exactly against this point. Let me ask you about just, I know this actually, I don't think it was referred to in Judge Andrews' opinion, but I think in the transcript he raised this hypothetical, which is under your construction, if there were a DJ, if a party filed a DJ that resulted in a judgment of invalidity, is it possible that the claim has not been asserted against the third party with respect to this provision? Yes, that question did come up on oral argument, and hypothetically I guess you could have a situation where there would be no adjudication. But I think the reality, Your Honor, is that in almost every case where there is a DJ complaint, there would be some form of either a counterclaim back saying there was infringement, or there would be an affirmative defense saying that there was infringement or that the patent is valid. So in those types of cases, even though a DJ action was brought, the patent would be asserted by virtue of a counterclaim or an affirmative defense. Let me also, I'm sorry to monopolize your time, but I just have one other question about you mentioned, and I appreciate, that I think at the outset that the two cases before us involved the same provision, and so that would dictate, and I want to be clear, would that necessarily dictate the same outcome in both cases, or in other words, is our construction of the license agreement dispositive, and does it resolve both appeals? Your Honor, I think the language that's important in 1.2D requiring a holding of all claims of the patents were both asserted and adjudicated, and that holding goes to either non-infringement or a combination. That language is the same and would apply equally to both Milan and Alchem. I would point out that with respect to the five patents that were the subject of the dismissal, that adjudication was with claim preclusion, so there was an adjudication with those five patents. The three patents that were the subject of the non-infringement finding on summary judgment, they were only a subset of the eight, and so for 1.2D to be enacted or to be a trigger, you need a holding, as the language says, of all eight patents or all claims of all eight patents, and that simply did not happen in this Westward case. I know it's not in dispute or it's not an issue in this case, so I'm not bringing new matters in, but I'm just interested in what you keep referring to. The last portion of the disputed provision says any combination of not infringed and invalid or unenforceable. Combination is a hard word to construe. A combination of not infringed and invalid or unenforceable. Does that mean just invalidity with nothing on infringement necessarily because it's not reached or unenforceability? Is that sufficient to satisfy this? Is that what you mean by a combination? I don't know what you mean by a combination. I'm happy to address that, Your Honor. I think, first of all, the purpose of that language is that you need a substantive determination of all the issues, and so to the extent that there are multiple patents involved, some patents may not be infringed and then other patents may be either invalid or unenforceable. So you're addressing all. Again, I think it highlights the importance that you need all the patents that have been asserted and adjudicated to be resolved by way of a holding. That's, I believe, the purpose of combination. That's helpful. I didn't see the combination as applying to the different claims and so forth. So thank you. Let me move you on to the irreparable harm piece of this because I don't see that you're arguing that irreparable harm under the usual factual standards, the fact-finding. That doesn't seem to be your argument here. Your argument seems to rest pretty much exclusively on the provision in the contract which deals with the stipulation of irreparable harm. Am I reading that correctly? I would say it a little bit differently, Your Honor. I would agree that the language of Section 1.10 emphatically illustrates that the party stipulated both mile and outcome that there would be irreparable harm if Sections 1.2d or 1.4 were breached. We believe that happened, and so there is an agreement that there is irreparable harm. Unlike a lot of cases, Section 1.10 goes even farther, and it states, again, mile and an outcome agreed that we're entitled to immediate injunctive relief. So, yes, that is in the license agreement. And to your final point. So could I ask you too? Oh, sorry. Let me just ask you about what you've just said so I don't lose my chain of thought, which is so you're saying clearly your analysis rests on our conclusions with respect to the interpretation of 1.2d. So if we disagree with your construction of that, then that eliminates your argument with respect to irreparable harm. Right. Because it's based on a breach of the agreement and based on your construction of the agreement. Right? Actually, that was my second point I was getting to. The answer to that is no, Your Honor, because we did include in our papers and as an exhibit that we have lost sales with respect to a letter from, I'll find the citation to it, but it's a letter from Par Pharmaceutical, who is our partner with respect to the brand generic product. And, yes, there have been lost sales and there have been loss of goodwill, and we have been irreparably harmed with respect to the improper launch by Mylan and Alchem with respect to their admitted infringing ANDA products. But still, I still come back to the point I was making, which I think you don't disagree with, which is to the extent you're resting the provision that says we agree that we stipulate irreparable harm, that is predicated on an argument that they violated the agreement. And the decision of whether or not the agreement has been violated is the essence of this appeal here. So the irreparable harm stipulation only comes into play if we agree with your interpretation of the agreement. I will agree, Your Honor, that the 1.10 sections are predicated on a breach of the agreement, and to the extent there is a breach, which we believe there is, that there is agreed to already irreparable harm, and there is agreed language that there should be immediate injunctive relief. Correct. Can I just ask you one more question about that? And then I'll be quiet, I promise. But on the stipulation portion of it, it's an interesting issue, but do we have any cases that you're aware of where, I mean, in our view, the courts decide whether or not there's irreparable harm and injunction is warranted. And is there a case where this court has said we are willing to rely and accept a stipulation from the parties and therefore invoke our authority to assert an injunction just based on the party stipulation and in the absence of our own finding or the district court's own finding about irreparable harm? Are there any cases about that? There are cases, Your Honor. I think you're asking me about federal circuit authority. I'm not aware of federal circuit authority. I am aware of Delaware authority, and we do cite the TP Group case, and we believe the Delaware law is controlling on this point. And so, yes, in that sense. I know your bell has gone off, but I've been monopolized the whole time, so I want to turn to Judge Newman and Judge Hughes if they have any questions for you. Well, my question is the same as I've had all along, to make sure that we understand what the contractual intent and understanding was of the parties when this agreement was entered. At the time, it was known that Medicare was on the market. It was known how many patents there were. And all of this, as I said before, seemed to me to weigh on the side of Takeda's contractual position. At the same time, these interpretations have a certain color to them, and it can't be that it wasn't foreseen by counsel, and there's excellent counsel on all sides, to make sure that no gaps were held, and yet here is this gap. There is a product, a generic product on the market, which although not A, B identical, other than that is the same chemical, and these complications we see now can't have been unforeseen. I don't know if it's possible in a moment or two to bridge that gap, but that's been something that's troubled me from the beginning. Your Honor, I'm happy to address that. Thank you. I believe that the language of 1.2D was intended to be an exception. It should be narrowly interpreted to the extent there was an agreed date in 1.2A, and as a narrow exception, the exception of 1.2D requires the holding of all the patents. That didn't happen, and to the extent that Midegare was known, Midegare did not change the status quo. It was not kind of the type of event where Mylan or Alkem would be unfairly treated by having to wait. They agreed, as in other provisions of the agreement, that there were first filers. They weren't going to be in the first wave, and so what they're trying to do here is put the square peg through the round hole or the round peg through the square hole and try to get out from under an agreed-upon date. So, yes, I think that there hasn't been a change of the status quo. The status quo should remain. The agreed-upon date in 1.2A should control, and the Midegare product, which, if you correctly state, Judge Newman, was on the market, was known, was never intended by the parties to be some type of triggering event for 1.2D, and to the extent we have to get into the intent of the parties, following on Chief Judge Prost's comment about where the Delaware case is, there has not been discovery about that point, and to the extent you have to get into either extrinsic evidence or parole evidence, we haven't gotten there yet. And so even though it's our position that 1.2D is clear and unambiguous, if reasonable people can disagree as to what it means, I think the case should be remanded for that type of discovery. Our preference, obviously, would be for the decision to be vacated and the Delaware court be instructed to issue an injunction. But to the extent there's questions about intent and a proper construction in view of the parties' respective intent, I think there needs to be discovery. I'd like to reserve subject to more questions. Let me just turn to Judge Hughes and see if he has any. Thank you. I don't have any questions. Okay. All right. We'll restore some of your rebuttal, and we appreciate your response to this, Mr. Fleming. Let's turn to the other side. Mr. Summers and Ms. Summers, you have 20 minutes. Are you dividing it 10 minutes a piece? Your Honor, this is Michael Summers. Good morning. I'm going to be making the principal argument, and Ms. Summers will address any questions the panel may have with respect to outcome-specific issues. Otherwise, our goal is for me to cover the field. Okay. As long as Mr. Lichtenberg understands then how to run the clock, that's fine with me. All right. Please proceed. Thank you. Good morning, and may it please the Court. My name is Michael Summers. I represent Appalee Mylan Pharmaceuticals. The decision of the District of Delaware denying Teceda's motion for a Teceda failed to satisfy any of the four elements necessary to warrant the extraordinary relief of a preliminary injunction. Judge Andrews in the District of Delaware read the relevant contract section. He read the words, asserted and adjudicated, and with neither party arguing that those words were in any way ambiguous, the District Court ruled that they meant just what they said, and that those words did not at all support the extraordinary relief being sought by Teceda. The District Court's assessment of the preliminary injunction package was in no way clearly erroneous. There was no abuse of discretion by the District Court in denying Teceda's motion. None. And as a result- Well, what about your friend's-sorry, I'm going to interrupt. This is Sharon Probst. What about your friend's argument that he emphasized repeatedly that this is an exception? Presumably the view is this is a narrow exception. So if it is construed as a narrow, narrow exception, why shouldn't it be fairly confined to the more limited reading that they are giving it in terms of asserted and adjudicated? Well, Judge, the starting point, as you all know, are the words in the contract. These are sophisticated parties with experienced counsel. Just as Judge Newman pointed out a moment ago, who negotiated this contract. And so Delaware law teaches us, and, of course, the law of the Federal Circuit is no different, that the starting point is the language the parties put in the contract. So what we have here is exactly what came to pass in the Westward litigation. There were claims, patents that were asserted and adjudicated in that action. Yes, there were originally eight. There's no dispute about that. But by the time the case was being adjudicated, there were three. That is, Takeda dismissed five of them voluntarily and chose to no longer assert those patents. They thereby became unassertive. And the district court then in the Westward case adjudicated those three and ruled that they were all not infringing. It is against that background, that factual litigation background, that we have this written license agreement that was negotiated and provided a launch trigger for precisely a scenario of what happened in the Westward litigation. And when Milan then alerted Takeda that it was going to launch, and then Takeda did nothing for well over a month, and Milan did launch, Takeda brought its action for preliminary injunction in the district court, seeking to rewrite what the contract says, and they're not permitted to do that. And that's why I say the starting point has to be the words in the contract itself and the meaning of those words. And by the way, there is an integration clause here. Takeda is urging this panel to add new sections to the contract, new interpretations that are not faithful to the clear and unambiguous language of the contract, and that lies in the face of the integration clause. But if I may, I really want to start with where the parties don't disagree, where there is agreement. Because until this morning, maybe 15 minutes ago, both Milan and Takeda agreed that the five licensed patents that Takeda voluntarily dismissed in the Westward litigation were not adjudicated. Their position, as I said, until 15 minutes ago, is those five patents were not adjudicated. I can cite the panel to Takeda's appeal brief, ECF number 35 at 24, where they said with respect to those five patents, quote, there was no adjudication at all. In their reply brief, ECF number 56 at page 7, they wrote, the claims of five of the patents that were asserted in the Westward litigation were never adjudicated. And in their reply in support of their motion for an injunction pending appeal, which is ECF number 26.1 at 5, they wrote, Takeda, quote, has consistently argued to the district court as well as to this court that only three of the eight patents in the Westward litigation were adjudicated and that the five remaining patents were not adjudicated. We'll ask your friend about that on rebuttal because I didn't call him on it, but that was my recollection too. So what do you understand? So you're contending that his position changed this morning. So what's the change that you're referring to? Frankly, Your Honor, he's not permitted to change an argument, a position that was advanced to this court in his brief. No, I'm just asking you to clarify. You're alleging that he's changed his position, and I just want to be clear on what you contend the change is. The change is prior to today, Takeda clearly took the position that the five dismissed patents were not adjudicated. This morning, counsel is arguing that they were adjudicated. I just pointed out three places in their brief to this court where they took the position prior to today that they were not adjudicated, and as a result, there were only three patents that were asserted and adjudicated, and those are the only relevant patents for Section 1.2D. Okay, let me ask you, I just want to be clear on this. Let me ask you, this is all a little mumbled in my mind, but is that not what you argue is a different position that they asserted an argument here? Is that not the position that was argued by the amicus brief? Yes, and that's why I was prepared to say this morning that it's a little surprising and actually against the precedent of this court for an amicus to come in and take a position at odds with all three parties that are actually litigants. You have two different contracts here, Milan and Takeda on the one hand, Alcom and Takeda on the other hand. No, no, no, but is it your position, I'm sorry, I'm interrupting, but is it your position that the switch that you allege Takeda has embraced this morning is switching from its original position to the position that was taken by the amicus on appeal here? I just want to be clear on what positions are. Yes. Okay, all right, thank you. We'll ask your friends about that. There was a second way in which the parties agreed, and that was that the three remaining asserted patents were all adjudicated in the Westwood case. In other words, prior to this morning, Takeda did not dispute that the only three licensed patents that were, quote, asserted and adjudicated, close quote, in the Westwood case were held non-infringing. And that is what the contract requires for section 1.2D to be triggered, and that is what the district court found, and it was not clearly erroneous. In fact, right at the end of his argument, my friend, Mr. Fleming, said, hey, reasonable people could differ here. Now, I don't agree with him. I think the language is clear and unambiguous. But even if you accept that, there is no way to conclude that Judge Andrew's decision was clearly erroneous. It's a concession that my adversary has now made this morning, and that really should be the end of this appeal. For the clear and unambiguous words of section 1.2D allow Milan to launch, where the patents that were asserted and adjudicated are held non-infringing, and that's precisely what came to pass. Well, what's your view on the law, on the prong of likelihood of success on the merits? If there are two reasonable positions asserted, is that enough to satisfy the likelihood of success on the merits, or is it sort of, in your view, as a matter of law, insufficient? It is the latter, Your Honor. They bear a heavy burden. The burden is actually higher in the preliminary injunction context, where the motion for preliminary injunction has been denied. In order for this court to reverse Judge Andrew's careful analysis of the contract language, it would have to find that his views were clearly erroneous and an abuse of discretion. This court has repeatedly said that the movement on such an appeal has a very heavy burden. So, you know, that is why I sort of seized upon the language that Mr. Fleming said at the end of his argument, that reasonable people can differ. That does not come... But construing a contract, construing a contract is pretty much a legal question and not a factual question, right? Right, and that's why the starting point that the district court took was the right starting point. It looked at the language of the contract. And, you know, that's why our position has always been that what Takeda is trying to do is actually read out the words from the contract that say, and adjudicated, because all they want this court to focus on are the original eight claims that were asserted. That's it. They say, that's it. Stop reading the contract. You cannot read out the words, and adjudicated, because the term there is asserted and adjudicated. Takeda also suggests that we're reading out the word all. Well, that's not true at all. Of the three asserted patents that went to the court for adjudication in the Westwood case, if one or more of those was not held to be unenforceable, then we acknowledge that the 1.2D trigger would not apply. So, you know, that's why we are of the view that each of the words in the contract has to be viewed. Your Honor asked the question about the declaratory judgment back and forth in the district court. And Takeda's counsel conceded that that was a possibility. And, of course, what's so important about that is the language is asserted against a third party, which means there is a provision there that gives Takeda the power to decide what patents it wants or does not want to assert. That's what they carved out for themselves in the contract. But once they dismiss those voluntarily, then they are no longer asserted, and the only relevant patents are those that are both asserted and adjudicated. So, you know, faced with the plain language, what does Takeda argue? They start making intent arguments. As Judge Newman herself noted, you know, these are really intent arguments that are being advanced to try to persuade the panel that what the words in the contract say should not be read at their face value. Let me give you a few examples of their intent argument. First, they argue, and argued again this morning, that, you know, oh, this was intended for a change in the status quo in the Colchicine market. Well, that argument was properly rejected by the district court. First, there is nothing whatsoever in the text of Section 1.2D that even remotely suggests that the third party action must involve a generic equivalent to Colchris. Well, let me interrupt here at this point because I think it really is quite important. The position, Mylan's position now is that all of these provisions, these elaborate conditions that went into this section of the contract, really are meaningless because of an arrangement that was made two years earlier that everyone knew about that now is being called on as negating the face of the terms that were in the contract. How could we reconcile that? It would be different if the westward agreement came later. It would be different if Mideagare wasn't on the market. But all of these conditions were already there, and just to cut through everything, what Mylan eventually did is said, never mind, we're going to launch. The contract doesn't count because, and they can't say that things have changed because they haven't changed. Everything was the same as it had been before. Now, what's wrong with that? Yeah, so Judge Newman, I think those are fair and important questions, and I have two answers, if you'll indulge me. The first is, and I know I sound like a broken record, but this is a sophisticated party with experienced counsel, and if they wanted to limit the contract in some way, either to change in status quo or generic equivalent, they could have done so in the contract. And let me just address generic equivalent. Then I'll get back to Mideagare. I'm going to address them both. With respect to whether 1.2D should be read to cover only generic equivalents, the only thing I want to point out to the panel is that the parties knew precisely how to do that. In other subsections of Section 1.2 itself, they did do just that. For example, 1.2B is specifically limited to generic equivalents. So is 1.2F. In other words, they knew how to do this. But in 1.2D and in 1.2G, the parties negotiated and did not include a limitation on generic equivalents. And Judge Newman, to your point about Mideagare, the fact that Takeda is arguing, oh, there has to be some change in the status quo, and they argue, well, Mideagare was already on the market. But the fact that Mideagare was on the market when the license agreement with MILA was consummated did not in any way alter the impact of the Westward litigation for purposes of Section 1.2D. First, as Takeda itself has admitted, Section 1.2D was to address a change in the status of the license patents, not a change in the market due to product entry. Takeda has conceded that. Second, before the litigation, Mideagare and its authorized generic were in the market at risk. As a result of that litigation, that was a seismic change. Remember, Takeda took the position in the litigation that Mideagare posed a cosmic threat to its cold-pressed business because the products were so similar. So now you have a finding that it's non-infringing, so Mideagare is no longer at risk. And third, the Westward litigation confirmed Takeda's inability to enforce the three license patents against potential future Mideagare generic competitors, which, of course, again impacts the Colchicine market. So all three of those changes were very significant to the status quo, but I really urge that the first answer is if they wanted to put that in the contract, they should have put it in there, and it shouldn't be part of an appellate court argument where they're asking it now to be inserted. There was also reference to the earlier filers in Mr. Fleming's argument. I'll briefly address that. Takeda is arguing that, you know, the fact that these so-called early filers give some new gloss to the agreement. Again, there is no such guarantee in the contract that the early filers can launch first. It does not exist. If Takeda wanted that, they should have negotiated for that, and they didn't. Second, the district court's confirmation of the clear words of Section 1.2d does not in any way prevent Takeda from accomplishing that objective. In other words, Section 1.2d requires Milan to wait a certain number of days after the final court decision before it can launch. Presumably, Takeda agreed that the earlier filers could launch immediately. We made that argument. There was no response in their reply brief. So the earlier filers' argument is really beside the point. I would like to get briefly to the irreparable harm. I'm going to pause for a second to see if the panel has any further questions on the likelihood of success problem. Okay. Thank you, Judge. So first, Chief Judge, let me just answer your question. You asked the question, hey, is there any authority out there that these stipulations really absolve the court of making a determination of irreparable harm? And counsel acknowledged there were none in the federal circuit. He did point to the TP group Delaware case. I will point out to the panel, and I'm sure you know this already, that irreparable harm was found in that case, but it was not on the basis of a stipulation. There is not a single decision of this court, or any other court that we have identified, where stipulation as to irreparable harm has been sufficient in the absence of a finding of likelihood of success on the merits. I think, Judge Gross, you were correct when you first put to counsel, look, you're relying solely on Section 1.10. And that is right because Takeda has not come forward with any evidence that could possibly support a finding of irreparable injury in the absence of that section of the contract. And if we didn't breach, it's not relevant. They do suggest some type of price erosion or loss of market share, but there's no evidence in this record to support that. Zero. Well, let me ask you about your first legal point. I just argue against myself all of the time. So even though it is odd to me that the parties would be able to adjudicate on behalf of whether there was irreparable harm, certainly if the parties went further than irreparable harm, and contractually agreed that if they are found to breach Part A, then they agree that loss of market and effectively enjoin itself, that would be appropriate. They wouldn't be transcending the role of the judiciary if the parties stipulated doing that, right? So if that's true, then what's the problem with them stipulating to irreparable harm? Well, first of all, you're not going to persuade me to say anything other than you should be guided by the parties' agreement because you just adjudicated parties. But more directly to your answer, Judge, yeah, they could have done that. But my only point is without a finding of likelihood of success on the merits, a stipulation on irreparable harm has never carried the day on the preliminary injunction. That's my point. That's what the law says. And even the cases cited by Decatur do not say otherwise. Okay. I think your time is up. I'm sorry. Then I will stop talking. Thank you, members of the panel. Okay. And, Michael, how much more time is left on the 20 minutes for Ms. Summers? I'm not sure how we were dividing it up. Sure. So that was the full 20 minutes. The idea was that if we were to jump in, she would just contribute to the 20. All right. So why don't you just take a couple minutes, if you can, Ms. Summers, and firstly answer the question that we're all thinking about, which is how, if at all, is your case different in terms of what our job is here than the Mylan appeal? Thank you, Chief Judge Prost. May it please the Court, Teresa Summers. It is our view that the contract provision at issue is essentially the same between the cases. And so we do not see any significant difference that would cause any different opinion to come out between the two sides. Okay. And are there additional issues that we need to be taking care of in your appeal, just controlled by whatever we decided on the other case? Yes, that is correct, Your Honor. But if I may add, just take just a few seconds to highlight a couple of things that came out through the discussion that we've had so far this morning, if I may please have a minute or two. Yes. And we'll also give the other side comparable time. So, yes, that's fine. Okay. Thank you very much. So the first point I wanted to make with respect to Section 1.2 and the various provisions that are set forth therein for launching, there are several, of course, as you know, 1.2a all the way through g. And none of these have any sort of primacy or priority. None of them are really exceptions. They're all set forth as they're set forth. Okay. I'm back. I think you hear me. This is Sharon Charles. Yes. Thank you, Your Honor. So just a very short, simple point, which is that the provisions set forth in Section 1.2 are all independent. None of them is really an exception. There's just different, you know, triggering points. So that's the one point I wanted to make with respect to the likelihood of success on the merits. Then with respect to irreparable harm, I did want to point out that Section 1.10 states that, in this particular case, Elkham acknowledges that marketing and the product in breach of paragraph 1.2 would cause Takeda irreparable harm. So that ties into the point where if there's a likelihood that there is no breach of paragraph 1.2, then that takes care of the irreparable harm. Okay. Thank you. Mr. Fleming, Mr. Luxenberg, how much time did Mr. Fleming have remaining on his rebuttal? So I had added originally two additional minutes based on your initial conversation with him. And so in total, out of the 22 minutes he had, he only had eight seconds remaining. In addition to the 20 minutes that Appellee's had, Ms. Summers also took about three minutes. Okay. Well, we'll give you an additional five minutes. We'll give you five minutes of rebuttal time, Mr. Fleming, just to keep it even and to make sure you have enough opportunity. So please proceed on rebuttal. Thank you, Your Honors. First of all, I want to be very clear. There was allegations that Takeda has either waived or changed its position. That could not be more incorrect. And it was the reason why, when I initially made my comments with respect to the five patents that were voluntarily dismissed, I cited to the opening brief and the PI brief where, indisputably, Takeda makes statements that a voluntary dismissal is an adjudication. That has always been our position. We've cited the Levi-Strauss case, which states at 719F3rd 1373, a stipulated dismissal with prejudice operates as an adjudication on the merits for claim preclusion purposes. So for claim preclusion purposes, the voluntary dismissal did adjudicate those five patents. I do agree. Can I just finish? Okay. I'm sorry. Go ahead. You finish. I'm sorry. I do agree that the summary judgment decision did adjudicate the three remaining patents on the issue of non-infringement. The language of 1.2d, however, requires that you have to look at all the patents that were asserted and adjudicated. So, yes, only three patents were adjudicated to a holding of non-infringement. I agree with that. However, the holding that's required to satisfy 1.2d requires that you look at all. And as Mr. Summers correctly says, you have to look at all the words, and all is in there. And with respect to all the licensed patents that were asserted and adjudicated, that includes eight patents. There was no holding that adjudicated all eight patents. The voluntary dismissal was an adjudication. We've repeatedly said it was an adjudication for claim preclusion purposes. Well, I just want to be clear because I also, and I think it's several places, but look at your brief at page 24. You said, with respect to the remaining five patents, there was no adjudication at all. Do you stand by that statement this morning? The sentence goes on, let alone an adjudication one way or the other regarding infringement, invalidity, and unenforceability. So, yes, I am standing by the statement that there was no adjudication holding non-infringement. I would direct you to page 18, Your Honor, where I say at the bottom, accordingly, irrespective of whether the voluntary dismissal is regarded as an, quote, adjudication, close quote, for claim preclusion purposes, the voluntary dismissal did not trigger section 1.2D, since it was not a, quote, holding that all the unexpired claims of the licensed patents are either one not infringed or a combination not infringed, invalid, or unenforceable. The point is, there was only three patents. Sorry. Go ahead. Go ahead. Sorry. My point, Your Honor, is that, yes, only three patents were adjudicated on the issue of non-infringement. 1.2D, you cannot ignore the five patents that were adjudicated for claim preclusion purposes. I've never said they were never adjudicated for claim preclusion purposes. We said and repeatedly cited the Levi Strauss case. And, interestingly, Myland understood that, and I would direct your attention to page 55 of their brief, where they actually make the statement, Takeda recognized that regardless of whether a stipulation of voluntary dismissal has the effect of an adjudication between the parties. They knew our position was that with respect to the five patents, there was an adjudication. That adjudication was to claim preclusion per the Levi Strauss case. I would note also that in Myland's response today, that they have attempted to add words to 1.2D. They want to say that you only look at the patents at the time of the summary judgment. They called the five patents unasserted. They're reading words into 1.2D. 1.2D is very clear that you need a holding that addresses all, A-L-L, unexpired claims of the patents. There were eight patents that were asserted and adjudicated. We've consistently said that those five patents that were voluntarily dismissed were adjudicated for claim preclusion purposes. We also said that only three patents were adjudicated for a holding of non-infringement. I think we've been consistent throughout our argument, Your Honor. My colleagues have anything further? No, nothing further. No. Okay. Well, thank you. And we thank both sides. We appreciate your cooperation under these unusual circumstances and, of course, are very grateful to our staff for all of their heavy lifting. So the cases are submitted. Thank you all. That concludes the proceeding for this morning. The Honorable Court is adjourned from day to day.